# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KRISTIE LOUISE HARTMAN** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02:13-cv-00265-TFM |
| | ) | |
| **CAROLYN W. COLVIN**, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

May 5th, 2014

## I.     Introduction

Kristie Louise Hartman ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g), which seeks judicial review of the final determination of the Commissioner of Social Security ("Commissioner"), which denied her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403, 1381-1383(f). This case comes before the Court on the parties' cross-motions for summary judgment. (ECF Nos. 8, 10). The Record has been developed at the administrative level. (ECF No. 6). The motions have been fully briefed (ECF Nos. 9, 11) and are ripe for disposition. For the following reasons, the Commissioner's motion will be **GRANTED**, and Plaintiff's motion will be **DENIED**.

## II.     Background

### A.     Procedural History

Plaintiff filed applications for DIB and SSI on December 21, 2009, having alleged

disability as of September 1, 2005, due to "degenerative back disease." (R. 159, 164, 189). Although Plaintiff alleged disability as of September 1, 2005, she had a prior claim pending in this Court at the time she filed the claims that are the subject of this action. *See Hartman v. Astrue*, No. 11-cv-00162-SJM (W.D. Pa.). Thus, Administrative Law Judge James J. Pileggi ("ALJ") only adjudicated the period after December 8, 2009, the date of the ALJ's decision in the prior case. (R. 12). The claims were initially denied on March 19, 2010. Plaintiff then requested a hearing, which was held on October 19, 2011, in Erie, Pennsylvania, before ALJ Pileggi. (R. 9-20, 105). Plaintiff was represented by counsel and testified at the hearing. (R. 24-53). An impartial vocational expert ("VE") also testified. (R. 46-53). On November 21, 2011, the ALJ issued a decision which denied Plaintiff's claims. (R. 19-20). The ALJ's decision became the final decision of the Commissioner on June 28, 2013, when the Appeals Council denied Plaintiff's request for review. (R. 1).

Plaintiff filed her Complaint in this Court on September 4, 2013. (ECF No. 2). The Commissioner filed an Answer on December 9, 2013. (ECF No. 5). Cross-motions for summary judgment then followed. (ECF Nos. 8, 10).

**B.     Factual Background**

Plaintiff was 38 years old as of the date of the ALJ's decision. (R. 159). She is a high school graduate with training as a personal care assistant and past work experience as a bus driver and cook. (R. 178, 190).

The treatment records in this case stretch back to 2001—which predates the alleged onset date by approximately eight years. Nevertheless, these records have been considered as background. Plaintiff has a history of impairments dating back to the mid-2000s, including bilateral hand pain, foot numbness/pain, weakness in her legs that caused her to fall on numerous

occasions, and back pain. She also at times complained of dizziness and trouble balancing, and she fought depression, as well. In mid-2007, she was diagnosed with carpal tunnel syndrome by her primary care physician, Laura McIntosh, M.D., at St. Vincent Sports Medicine. MRIs from around this same time revealed mid disc bulges in the cervical spine at C3-4 and C5-6 and in the lumbar spine L3-4. While objective testing showed that Plaintiff's condition remained stable throughout this period, she continued to complain of limitations in her daily activities. She intermittently attended physical therapy and received epidural injections for her complaints of back pain, but neither of these treatments seemed to benefit her. In addition to seeing Dr. McIntosh on fairly regular visits, Plaintiff was referred to a neurologist prior to the alleged onset date, who apparently could not determine a cause for Plaintiff's complaints.

On October 23, 2009, approximately six-to-seven weeks before the alleged onset date, Plaintiff saw a second neurologist, Angela Lu, M.D., at the UPMC Neurology Clinic. (R. 304). Plaintiff reported that she had been experiencing chronic low back pain for a very long time, but noted that the pain seemed to have worsened since 2006. (R. 304). Plaintiff also reported that she had developed pain in her legs, along with weakness and numbness. (R. 304). She described similar feelings in her arms and hands, which caused her to have difficulty opening jars and holding up a newspaper. (R. 304). Dr. Lu could not determine the cause of Plaintiff's numbness, paresthesias, and subjective weakness. (R. 305). Dr. Lu ordered blood work and an MRI and suggested that Plaintiff follow-up afterwards. (R. 400). After this date, however, there are no records of Plaintiff following-up with Dr. Lu.

The first record from within the relevant time period is dated December 17, 2009. On that date, Plaintiff saw Kathe S. Bryson, M.D., of Arthritis Associates, upon referral from Dr. McIntosh. (R. 312). Plaintiff reported to Dr. Bryson that she had seen a pain management

specialist before and received medications and injections, which were ineffective. (R. 312). She also told Dr. Bryson that physical therapy had not been effective. (R. 312). In her treatment notes, Dr. Bryson remarked that Plaintiff's examination was "fairly benign." (R. 314). She also noted that she "suspect[ed] that [Plaintiff's] spinal symptoms are unrelated to the symptoms in her hands and feet." (R. 314). She suspected that Plaintiff might have seronegative rheumatoid arthritis, though her symptoms were not entirely consistent with such a diagnosis. (R. 314). Dr. Bryson ordered x-rays and indicated that she would review the results of Plaintiff's prior lab tests and MRIs in order to make a diagnosis. (R. 314). To treat Plaintiff's symptoms, Dr. Bryson started her on Plaquenil. (R. 314). As is the case with Dr. Lu, there are no other treatment notes from Dr. Bryson in the Record.

Plaintiff returned to Dr. McIntosh's office on January 29, 2010, for a follow-up "on her arthralgias, myalgias, upper and lower extremity numbness and depression." (R. 384). Her primary complaint, however, was a sore throat. (R. 384). Dr. McIntosh's notes indicate that Plaintiff's husband accompanied her to this appointment because he was concerned about her worsening depression. (R. 384). The treatment notes also reveal that Plaintiff had stopped driving because she was unable to feel the steering wheel. (R. 304). Plaintiff reported that her condition was largely unchanged since her last visit. (R. 384). Dr. McIntosh noted that Plaintiff's lab work had been unremarkable to date. (R. 384). She prescribed prednisone to alleviate some of Plaintiff's back pain and Pristiq for her depression. (R. 386). Dr. McIntosh concluded by noting that Plaintiff should follow-up with her after visits to the rheumatologist and neurologist. (R. 386).

Plaintiff sought treatment from Jeffrey Kim, D.O., at St. Vincent Sports Medicine, on June 16, 2010, again complaining of a sore throat and sinus congestion. (R. 381). Plaintiff

reported that she had carpal tunnel surgery scheduled at the end of the month and wanted to ensure that she was recovered by then. (R. 381). Dr. Kim diagnosed her with acute sinusitis and started her on a z-pak. (R. 383).

Plaintiff was reevaluated by Dr. McIntosh on July 28, 2010, one month after her carpal tunnel surgery. (R. 378). Plaintiff reported that she had been receiving injections in her lower back since May and reported experiencing spasms in her back following her injections. (R. 378). She also indicated that she had not seen any improvement in her numbness and that she was having EMGs done on her right hand in anticipation of having a second carpal tunnel surgery performed on that side. (R. 378). Dr. McIntosh noted that Plaintiff was still having symptoms "but does seem to be a bit better." (R. 380). In fact, Dr. McIntosh noted, Plaintiff's symptoms "sound[ed] more like severe depression—the sleeping and severe fatigue." (R. 380). However, Dr. McIntosh noted that she would confer with Plaintiff's rheumatologist and neurologist before making a definitive diagnosis. (R. 380). "If these evals are negative," Dr. McIntosh remarked, "[Plaintiff] might benefit from referral to a counselor." (R. 380).

Plaintiff followed-up with Dr. McIntosh on September 6, 2010. (R. 370). Plaintiff reported that despite her carpal tunnel surgery on her left hand, she still experienced numbness and tingling in the fourth and fifth fingers. (R. 370). She reported that she was having problems with her right hand, as well, such as difficulty holding onto and gripping things. (R. 370). Similarly, her back pain persisted and she continued to have numbness and weakness in her legs. (R. 370). In particular, she explained, she had recently helped her daughter move her bedroom and carry boxes, which led to knee pain while walking and engaging in any weight-bearing activities. (R. 370). With respect to her emotional state, Plaintiff described feeling "very flat, low and very apathetic." (R. 370). Upon examination, however, Plaintiff displayed no abnormalities,

with the exception of limited flexion and tenderness in her knees with a positive grind test bilaterally. (R. 371-72). Just as she had done back in July, Dr. McIntosh noted that Plaintiff's depression "seem[ed] to be her most pronounced issue." (R. 373). Several medications had been tried, according to Dr. McIntosh, with no significant benefit. (R. 373). As a result, Dr. McIntosh discussed other treatment options, including referral to a psychologist or psychiatrist with experience dealing with patients complaining of diffuse pain. (R. 373). As for Plaintiff's knee pain, Dr. McIntosh indicated that there was no evidence of any ligament or meniscus damage. (R. 373). However, there was some patellofemoral dysfunction noted, which Dr. McIntosh suspected arose from Plaintiff "recent bout of increased activity in light of her general minimal activity." (R. 373).

On October 6, 2010, Plaintiff saw a psychologist, Lisa M. May, Ph.D., for an evaluation to determine her capacity to undergo lap band surgery. (R. 491). Based on the results of her interview with Plaintiff, Dr. May recommended delaying the procedure for at least six months due to her depression. (R. 492). She also suggested that Plaintiff should undergo individual counseling, as it would "be very important to help her get some control of her depressive symptomology, as well as develop appropriate, healthy coping strategies that do not include the utilization of food as a comfort means" before proceeding with the planned surgery. (R. 493).

When she returned to Dr. McIntosh's office on October 8, 2010, for a pre-lap band procedure visit, Plaintiff complained of difficulty sleeping. (R. 367). She also described feeling nauseous and attributed this feeling to her medications. (R. 367). Dr. McIntosh reported that Plaintiff had been seeing Dr. Cernak for her carpal tunnel, from whom she recently received a steroid injection aimed at reducing inflammation and numbness. (R. 367). Plaintiff informed Dr. McIntosh that she anticipated needing another surgery for the carpal tunnel in her right hand. (R.

367). Upon examination, Dr. McIntosh noted that Plaintiff was well developed, well nourished, and did not seem overly emotional. (R. 369). Plaintiff described being more active at home and seemed to be involved in household responsibilities. (R. 369). Dr. McIntosh noted that she was glad Plaintiff finally got to see a counselor for her depression. (R. 369). Dr. McIntosh encouraged Plaintiff to keep a food diary and to identify ways to handle stress which did not include using food as a coping mechanism. (R. 369). She also noted that the Plaquenil could have been causing her sleep issues. (R. 369). Dr. McIntosh prescribed Ativan for several nights to help Plaintiff get some sleep and instructed her to return in a month. (R. 369).

At her visit the next month, Plaintiff reported to Dr. McIntosh that she thought her counseling sessions had been helpful. (R. 363). In particular, she felt that she was developing better self-awareness and self-esteem. (R. 363). Plaintiff reported negative side effects from Plaquenil, though it did seem to be helping with her joint pain. (R. 363). She described no longer feeling numbness while holding the newspaper, but explained that she continued to have numbness when the temperature dropped. (R. 363). She reported continued issues with her right hand and indicated that she expected to undergo a "redo" of her carpal tunnel surgery. (R. 363). She also indicated that she had been trying to reduce her stress eating and had been walking her son to the bus stop on a daily basis and then walking for a few additional minutes after dropping him off. (R. 363). Likewise, she reported being more active around the house and the yard, though she was not exercising on a regular basis for more than 10-15 minutes. (R. 363). Dr. McIntosh encouraged Plaintiff to start exercising 30 minutes per day, five-to-six days per week and to keep an exercise diary. (R. 365).

On June 28, 2011, Plaintiff returned to Dr. McIntosh with complaints of foot pain and arm pain. (R. 359). She reported that her son had been in a bad car accident and she had spent

much of the last few months with him in the ICU or in rehabilitation. (R. 359). As a result, she cancelled her plans for gastric bypass surgery and was no longer trying to lose weight or exercise. (R. 359). Dr. McIntosh re-diagnosed Plaintiff with plantar fasciitis—a diagnosis she had first made some time before the alleged onset date—and arthralgias in multiple sites. (R. 362). She recommended trying a prednisone burst to try to alleviate the inflammation and also starting formal physical therapy. (R. 362).

On September 13, 2011, Dr. McIntosh completed a physical RFC assessment form at the request of Plaintiff's attorney. (R. 488). Dr. McIntosh opined that Plaintiff was limited to carrying less than 10 pounds and standing/walking for two hours in an eight-hour workday. (R. 488). However, she had no limitations in her ability to sit. (R. 489). Dr. McIntosh believed that Plaintiff's numbness in her hands limited her ability to push and pull in both her arms and legs. (R. 489). In addition, she opined that Plaintiff could never climb, balance, kneel, crouch, crawl or stoop. (R. 489). She also found that Plaintiff was limited to occasional handling, fingering and feeling, though she could reach in all directions. (R. 489). Finally, Dr. McIntosh opined that Plaintiff would be medically unable to complete a full workday due to her impairments, since "the number of breaks in a day won't compensate for the numbness in hands." (R. 490).

## III. Legal Analysis

### A. Standard of Review

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). The Commissioner must

utilize a five-step sequential analysis to evaluate whether a claimant has met the Act's requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent her from performing her past relevant work; and (5) if the claimant is incapable of performing her past relevant work, whether she can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003). If it is determined that the claimant cannot resume her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education, and work experience, she is able to perform substantial gainful activity in jobs available in significant numbers the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)(3), 1383(c)(3)(4); *Schaudeck v. Comm'r Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999). However, the district court's review of the Commissioner's findings of fact is limited to determining whether substantial evidence existed in the record to support the Commissioner's decision. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Substantial evidence means "more than a mere scintilla." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, (1971)). There must be "such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Id.* If the Commissioner's findings of fact are supported by substantial

evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.

When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Med. Cntr. v. Heckler*, 806 F.2d 1185, 90–91 (3d Cir. 1986).

**B.      The ALJ's Decision**

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful work activity since her alleged onset date. (R. 14). At step two, he determined that Plaintiff "has the following severe impairments: degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine, status post left carpal tunnel release surgery, status post right carpal tunnel release surgery, and obesity." (R. 14). At step three, however, the ALJ found that Plaintiff's condition was not severe enough to meet or equal any of the listed impairments. (R. 15).

Accordingly, the ALJ went on to assess Plaintiff's residual functioning capacity ("RFC"). (R. 15). The ALJ found that Plaintiff retained the capacity to perform light work with the following additional limitations: no crawling, kneeling, climbing, squatting, or balancing on heights; no operating of foot controls; no constant gripping or manipulating with the hands; no repeated bending at the waist to 90°; and no overhead work with upper extremities. (R. 15).

Although the ALJ noted that "[a] primary mental health impairment [had not been] established on the basis of the current record," he nonetheless accounted for Plaintiff's alleged mental health impairments by limiting her to simple, repetitive work, with routine work processes and settings, and no high stress, which he defined as no high quotas or close attention to quality production standards. (R. 15, 17). The ALJ claimed to have considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p" in making his RFC assessment. (R. 15). In addition, he explained, he considered all opinion evidence—including that of Dr. McIntosh—"in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p." (R. 15). In that respect, although he acknowledged that Dr. McIntosh found significant restrictions that were not reflected in his RFC, the ALJ concluded that her conclusions were not "fully credited" because "it goes against the weight of the evidence as a whole, including the doctor's own treatment notes. Still, many of the limitations reported by claimant's doctor have been incorporated in the [RFC] assessment . . . ." (R. 17).

At step four, the ALJ concluded that Plaintiff did not retain the RFC to return to her past relevant work as a bus driver or cook. (R. 18). However, at step five, the ALJ concluded, after hearing testimony from the VE, that Plaintiff could perform the following jobs, which the VE testified exist in significant numbers in the national economy: hostess (light exertional level); ticket taker (light exertional level); greeter (light exertional level); surveillance system monitor (sedentary exertional level); document preparer (sedentary exertional level); and addresser/sorter (sedentary exertional level). (R. 19). Therefore, the ALJ held that Plaintiff was not disabled within the meaning of the Act and denied her claims for benefits.

## C.     Discussion

Plaintiff challenges the ALJ's finding that she maintained the RFC to perform light work, arguing that the ALJ erred by failing to accord significant or controlling weight to the opinion of her treating physician, Dr. McIntosh.[1] Plaintiff also contends that insofar as the ALJ determined that there was a "discrepancy" in Dr. McIntosh's records, the ALJ was required to recontact her for clarification about the basis for her opinion.

### 1.     *Did the ALJ err in finding that Plaintiff retained the RFC to perform "light work"?*

Plaintiff contends that because Dr. McIntosh was the only medical source who evaluated her functional capacity, her conclusions that Plaintiff could only lift less than ten pounds and could not stand for more than two hours in a workday should have been adopted. Had the ALJ adopted these conclusions, Plaintiff contends, he would have been forced to find that she could not perform light work, which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and requires "a good deal of walking or standing," 20 C.F.R. § 416.967(b), *i.e.*, up to six hours in a workday, SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).

This argument has some merit. "Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. § 404.1545(a) ("Your residual functional

---

[1] It should be noted that the ALJ at least partially adopted all but two of Dr. McIntosh's conclusions into his RFC assessment. (R. 17). The climbing, balancing, kneeling, crouching, crawling, stooping, handling, fingering, feeling, and foot control restricted were all accounted for, at least in some respect. In two areas—overhead reaching and sitting—the ALJ went further than Dr. McIntosh, imposing restrictions that she did not find necessary. The ALJ did not, however, adopt Dr. McIntosh's opinion that Plaintiff could only lift up to 10 pounds and could only stand for two hours during a full workday, as his finding that Plaintiff could perform light work contradicts those findings. *See* SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). Thus, to the extent the ALJ committed an error, it could have only been by finding that Plaintiff could perform light work.

capacity is the most you can still do despite your limitations."). Although it is the ALJ's sole responsibility to determine a claimant's RFC, *see generally* SSR 96-5P, 1996 WL 374183 (July 2, 1996), "'[r]arely can a decision be made regarding a claimant's [RFC] without an assessment from a physician regarding the functional abilities of the claimant.'" *Biller v. Acting Comm'r of Soc. Sec.*, 962 F. Supp. 2d 761, 778-79 (W.D. Pa. 2013) (quoting *Gormont v. Astrue*, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). That is because an ALJ is not permitted to make speculative inferences from the record or "substitute his own judgment for that of a physician." *Id.* (citations omitted). He must have something upon which to ground his findings, and usually that something (or at least part of that something) is an opinion from an acceptable medical source. It is not surprising, then, that our Appellate Court "has found remand to be appropriate where the ALJ's RFC finding was not supported by a medical assessment of any doctor in the record." *Id.* (citing *Doak*, 790 F.2d at 27–29).

Here, as Plaintiff points out, Dr. McIntosh was the only doctor to offer a medical source statement about Plaintiff's condition. Although the ALJ "considered" this opinion, he decided that it could not be "fully credited" because it purportedly went "against the weight of the evidence as a whole, including the doctor's own treatment notes." (R. 17). The ALJ was certainly within his authority to reject Dr. McIntosh's conclusions, insofar as he found them unsupported or internally inconsistent. *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 255 (3d Cir. 2008); *Shaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 435 (3d Cir. 1999) (citations omitted). After doing so, however, he was required to point to some "medical evidence speaking to [Plaintiff's] functional capabilities that supports [his own] conclusion" as to Plaintiff's RFC. *Biller*, 962 F. Supp. 2d at 778. In that respect, the ALJ's decision fell short. *See Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001) (internal quotation marks omitted) (explaining that

the ALJ must provide "a clear and satisfactory explication of the basis on which [his RFC assessment] rests"). His failure to explain the basis for his conclusions robs the Court of the ability to adequately review whether that ultimate finding was supported by substantial evidence.[2]

The ALJ's error does not, however, require that the Court remand this case to the ALJ for further consideration. In response to the hypothetical question posed by the ALJ, the VE identified six jobs that Plaintiff could perform, three of which are considered sedentary work, which requires "lifting no more than 10 pounds" and only occasional walking and standing. 20 C.F.R. § 416.967(b). According to the VE's testimony, all together there are 65,000 jobs in the national economy at the sedentary level that Plaintiff can perform. (R. 19). Courts have "held that a relatively small number of positions, as low as 1,400 jobs, can qualify as significant." *Lawrence v. Astrue*, 337 F. App'x 579, 586 (7th Cir. 2009) (citing *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993)). Accordingly, the ALJ's error in failing to substantiate his finding that Plaintiff retained the RFC to perform light work was harmless. Even if Dr. McIntosh's conclusions regarding Plaintiff's severe lifting/carrying and standing/walking limitations were

---

[2] The Court recognizes that there is some disagreement among District Judges on this Court as to whether there is a bright-line rule requiring that an RFC determination be supported by a specific medical opinion. *Biller*, 962 F. Supp. 2d at 778, seems to suggest that there is such a rule—though its use of the term "rarely" leaves open the possibility that there may be cases when such an opinion is not required. By contrast, in *Doty v. Colvin*, the Court rejected the argument an ALJ can only discount a medical opinion based on a contrary medical opinion in the record. *Doty*, Civ. No. 13-80-J, 2014 WL 29036, *1 n.1 (W.D. Pa. Jan. 2, 2014). As the Court in *Doty* explained, "rejection of even a treating physician's opinion does not require reliance on another opinion. Such an opinion can be rejected on the basis of contradictory medical *evidence*, not just contrary opinions." *Id.* (emphasis in original). *Doty* relied on two decisions from the Third Circuit Court of Appeals, which seem also seem to contest the notion that an ALJ must always rely on a medical opinion when determining a claimant's RFC. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."); *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006) ("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC."). Additionally, the Court in *Doty* rejected a reading of *Doak*, 790 F.2d 26 that would "prohibit the ALJ from making an RFC assessment even if no doctor has specifically made the same findings and even if the only medical opinion in the record is to the contrary." *Doty*, 2014 WL 29036, *1 n.1. Fortunately, this Court need not decide which of these cases represents the correct view in order to resolve whether the ALJ committed an error. Not only did he not point to a contrary medical opinion, but he did not point to any contrary evidence whatsoever suggesting that Plaintiff could perform the demands of light work.

fully adopted and Plaintiff was limited to sedentary work, there would still be a significant number of jobs existing in the national economy which Plaintiff could perform.

### 2. *Did the ALJ err by failing to recontact Dr. McIntosh?*

Plaintiff next argues that the ALJ had a duty to recontact Dr. McIntosh before discrediting her opinion. Social Security Ruling 96–5p, upon which Plaintiff relies for this proposition, provides that

> if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner *and the adjudicator cannot ascertain the basis of the opinion from the case record*, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

SSR 96-5p, 1996 WL 374183, at *5 (emphasis added). The italicized language makes clear that the duty to recontact is triggered only "when the [treating source's] opinions are not clear." *Gabel v. Colvin*, Civ. No. 12-280, 2014 WL 126005, at *4 (W.D. Pa. Jan. 13, 2014). Conversely, the ALJ is not required to recontact a treating source "[s]imply because the ALJ found [the source's] evidence to be internally inconsistent and not well supported by the other evidence of record[.]" *Id.* The duty to recontact in SSR 96-5p mirrors that set forth in 20 C.F.R. § 404.1512(e). Under that section, which was applicable at the time Plaintiff's claim was adjudicated,[3] an ALJ is required to recontact a medical source "for purposes of clarification" when "'the report from [the] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.'" *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (quoting 20 C.F.R. § 416.912(e)(1)). As the United States Court of Appeals for the Third Circuit has recognized, the just-quoted regulatory language

---

[3] The regulations governing an ALJ's duty to recontact a medical source were amended, effective March 26, 2012. Under the current regulations, when faced with insufficient evidence to determine disability, an ALJ "may recontact [a] treating physician, psychologist, or other medical source" but may instead seek further evidence from another source, including the claimant himself. 20 C.F.R. § 404.1520b.

is preceded by an "important prerequisite": the ALJ is required to recontact a medical source *only* when "'the evidence [he] receive from [the source] is inadequate for [him] to determine whether you are disabled.'" *Id.* (quoting 20 C.F.R. 416.912(e)(1)).

In this case, the ALJ concluded that Dr. McIntosh's opinions were not entitled to significant weight because they were not supported by objective findings and were inconsistent with the other evidence in the record—not because the information provided by Dr. McIntosh was inadequate or because he could not "ascertain the basis" for her opinions. There was, in short, no "discrepancy" in the record for the ALJ to resolve. Therefore, the ALJ did not have a duty to recontact Dr. McIntosh.

## IV.    Conclusion

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges that Plaintiff faces in her daily life.  Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Social Security Act.

For these reasons, the Court will **GRANT** the Motion for Summary Judgment filed by the Commissioner and **DENY** the Motion for Summary Judgment filed by Plaintiff. An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KRISTIE LOUISE HARTMAN**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02:13-cv-00265-TFM |
| | ) | |
| **CAROLYN W. COLVIN**, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER OF COURT

**AND NOW**, this 5th day of May, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that:

1.    The Commissioner's Motion for Summary Judgment (ECF No. 10) is **GRANTED**.

2.    Plaintiff's Motion for Summary Judgment (ECF No. 8) is **DENIED**.

3.    The Clerk shall docket this case as closed.


                                          BY THE COURT:

                                          s/ Terrence F. McVerry
                                          United States District Judge

**cc:**    R. Christopher Brode
          **Email:** brodelaw@hotmail.com

          Christine A. Sanner
          **Email:** christine.Sanner@usdoj.gov

          via CM/ECF